## In the United States District Court
## for the District of Kansas

---

**United States of America**,
    *Plaintiff*,

v.            Case No. 17-20026-001-CM

**Jeffrey Plank**
    *Defendant*.

---

## Emergency Motion to Reduce Sentence
## Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i)

---

Mr. Jeffrey Plank, by and through counsel, David M. Magariel, respectfully asks the Court to reduce his sentence from 144 months to time served. The following reasons collectively constitute extraordinary and compelling reasons warranting immediate reduction of his sentence:

1.  Mr. Plank suffers from a combination of serious health ailments that put him at the highest risk of serious illness if (and when) he is infected by COVID-19 including congestive health failure, Type II diabetes, obesity, and COPD.

2.  He is imprisoned at FCI Forrest City, where the conditions have been described as "like Mad Max." FCI Forrest City currently has the second most positive cases of any BOP facility, and the numbers are only expected to rise. Forrest City recently tested all (or at least a large number) of those serving sentences at the facility. Mr. Plank was told he is being moved into a "positive" unit at the facility, which greatly increases his concern. As more information comes in, we

1

will update the Court on developments at Forrest City.

3. Mr. Plank proposes this Court grant him compassionate release with the added condition that he serve five-years' home confinement as a condition of supervised release in lieu of the remaining sentence he has to serve.

4. Mr. Plank also proposes the Court extend his term of supervised release by five additional years so that he serves the five-year term of supervised release this Court intended when it sentenced Mr. Plank.

The government has not taken a position on this motion.

## Relevant Facts & Recent Procedural History

### A. Mr. Plank's health

Mr. Plank is particularly vulnerable to COVID-19 at Forrest City. Mr. Plank has a number of serious medical issues that put him at the highest risk of suffering a severe illness related to COVID-19. We note that each health issue does not exist in a vacuum. The combination of ailments greatly increases the chances of Mr. Plank requiring hospitalization, intensity care, or death. A study in China showed that people with one underlying risk factor (categorized as cardiovascular disease, hypertension, and diabetes) were 79% more likely to require intensive care or a respirator that someone with no underlying health conditions.[1] Having two of those

---

[1] Dr. Tobias Barker (Chief Medical Officer, Paladina Health), *New Data Shows That Heart Disease and Hypertension Dramatically Increase Risk of Dying from COVID-19 (Coronavirus)*, Paladina Health Blog (March 10, 2020), at https://www.paladinahealth.com/blog/new-data-shows-heart-disease-diabetes-and-hypertension-dramatically-increase-risk-dying-covid; *also see* M. Yuan, et al *Association of radiologic findings with mortality of patients infected with 2019 novel coronavirus in Wuhan, China*, Plos One (March 19, 2020), at
https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0230548

2

diseases (which Mr. Plank has all three) increased that risk by two and a half times.[2]
The study also showed the risk of death from COVID-19 was over ten times higher for
people with cardiovascular disease, over seven times as high with diabetes and over
six times as high with hypertension.[3] Again, Mr. Plank has all three of these diseases.
We discuss each here.

### 1. Obesity

Recent data has found obesity to be "one of the most important predictors of
severe coronavirus illness."[4] Mr. Plank is 54 years old and is obese.[5] Mr. Plank's BMI
is 41.1.[6] Above 30 is considered obese.[7] Above 40 is considered severely obese.[8] Early
studies from New York University Langone Health show that people with COVID-19
under 60 "with a BMI of 30-34 were twice as likely to get admitted to the hospital or
be admitted to acute care.[9] People under 60 with COVID-19 and "a BMI of 35 or
higher were twice as likely to be admitted to the hospital and three times as likely to
end up in the intensive care unit."[10] Other studies are in line with the Langone study

---

[2] Id.

[3] Id.

[4] Roni Caryn Robin, *Obesity Linked to Severe Coronavirus Disease, Especially for Younger Patients*,
New York Times (April 16, 2020), at https://www.nytimes.com/2020/04/16/health/coronavirus-obesity-
higher-risk.html

[5] Exhibit 1 (Mr. Plank's health appraisal at Core Civic shows he is slightly over 6 feet tall and weighs
303 pounds).

[6] National Heart, Lung, and Blood Institute, *Calculate Your Body Mass Index*, (Accessed May 21,
2020), at https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm

[7] Harvard School of Public Health, *Obesity Prevention Score* (accessed 3/26/2020), at:
https://www.hsph.harvard.edu/obesity-prevention-source/obesity-definition/

[8] Center for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, (May 14, 2020),
at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html

[9] WebMD Health News, *Obesity new risk factor for young COVID patients*, (April 29, 2020), at
https://www.webmd.com/lung/news/20200429/obesity-new-risk-factors-for-young-covid-patients; *citing*
Dr. Jenifer Lighter, et al, *Obesity in patients younger than 60 years is a risk factor for COVID-19
hospital admission*, Clinical Infectious Diseases (April 9, 2020), at https://doi.org/10.1093/cid/ciaa415

[10] Id.

including one from Ochsner Health that showed "60% of patients hospitalized with COVID-19 had obesity and that obesity appeared to nearly double their risk of requiring a ventilator.[11]

The CDC states one reason why this risk is so high for people with obesity is "a serious breathing problem called acute respiratory distress syndrome (ARDS), which is a major complication of COVID-19 and can cause difficulties with a doctor's ability to provide respiratory support for seriously ill patients."[12] Death by ARDS is particularly agonizing because the patients essentially suffocated to death as a thick film covers the walls of the lungs, preventing oxygen from reaching the bloodstream and any of the vital organs.[13]

### 2. Congestive heart failure

Mr. Plank has been diagnosed with congestive heart failure.[14] He has also suffered multiple heart attacks in his life.[15] His heart is operating at 25 to 30 percent capacity.[16] Mr. Plank visited the Olathe Health Cardiology Services group in 2016. Mr. Plank was diagnosed with Nonischemic cardiomyopathy.[17] This form of heart disease weakens Mr. Plank's heart and makes it "harder for the heart to fill with

---

[11] Roni Caryn Robin, *Obesity Linked to Severe Coronavirus Disease, Especially for Younger Patients*, New York Times (April 16, 2020), at https://www.nytimes.com/2020/04/16/health/coronavirus-obesity-higher-risk.html

[12] Center for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, (May 14, 2020), at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html

[13] The New York Times, *How Coronavirus Attacks the Body*, (April 6, 2020) accompanying video available at https://www.youtube.com/watch?v=BuzP-uLctYE

[14] D.E. 39 at 11; Exhibit 2 (Olathe Medical Center Records)

[15] D.E. 39 at 11

[16] *Id*.; Exhibit 3 (Olathe Medical Center Records)

[17] Exhibit 4 (Olathe Health Cardiology Services Records).

blood and to pump blood" through the body.[18] This disease is "the leading cause of advanced heart failure, accounting for >50% of all heart transplantation procedures."[19]

People with serious heart conditions such as Mr. Plank are at higher risk for severe illness from COVID-19.[20] Specifically, COVID-19 "can damage the respiratory system and make it harder for your heart to work. For people with heart failure and other serious heart conditions this can lead to a worsening of COVID-19 symptoms."[21] Studies show that patients with pre-existing cardiovascular disease are ten times more likely to die than a healthy person after contracting COVID-19.[22] A study from China showed that 88% of the deaths in the group with cardiovascular disease also were obese.[23] The study concluded that patients with COVID-19, cardiovascular disease, and obesity were at higher risk of mortality.[24] The data show that the combination of obesity and cardiovascular disease puts Mr. Plank at serious risk of hospitalization or death from COVID-19.

### 3. Diabetes

---

[18] Cleveland Clinic, *Cardiomyopathy* (viewed May 21, 2020), at
https://my.clevelandclinic.org/health/diseases/16841-cardiomyopathy
[19] Bojan Vrtovec, *Cell Therapy for Nonischemic Cardiomyopathy*, Circulation Research, Vol 122 Issue 1 (Jan 5, 2018), at https://www.ahajournals.org/doi/10.1161/CIRCRESAHA.117.312385
[20] Center for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, (April 17, 2020), at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html
[21] *Id*.
[22] Dr. Dara K. Lee (Cardiologist Faculty at Harvard Medical School), *How does cardiovascular disease increase the risk of severe illness and death from COVID-19?*, Harvard Health Publishing; Harvard Health Blog (April 2, 2020), at https://www.health.harvard.edu/blog/how-does-cardiovascular-disease-increase-the-risk-of-severe-illness-and-death-from-covid-19-2020040219401
[23] Y.D. Peng, et al, *Clinical Characteristics and Outcomes of 112 Cardiovascular Disease Patients Infected by 2019-nCov* (2020), at https://pubmed.ncbi.nlm.nih.gov/32120458/
[24] *Id*.

Mr. Plank also has Type II diabetes.[25] People with diabetes are at higher risk of severe illness from COVID-19.[26] A study of patients in United States hospitals with diabetes and/or uncontrolled hyperglycemia found a "markedly higher mortality than patients without diabetes or uncontrolled hyperglycemia."[27] Data from the New York Department of Health showed that diabetes was present 37% of patients who died from COVID-19 (as of April 11, 2020).[28]

Because of these increased risks, the American Diabetes Association has written an open letter to all detention facilities, urging relevant parties consider "all possible strategies to release people with diabetes and other serious risk factors related to COVID-19, and to reduce the level of crowding in detention facilities."[29] That letter explains the combined risk to people with diabetes and heart disease, like Mr. Plank, is a worsened "chance of getting seriously ill from COVID-19 . . . because the body's ability to fight off an infection is compromised."[30]

### 4. Sleep apnea

Sleep apnea is a chronic condition that puts Mr. Plank at "a higher risk for

---

[25] D.E. 39 at 11; Exhibit 2

[26] Center for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, (April 17, 2020), at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html

[27] Dr. Bruce Bode (Clinical Associate Professor at Emory University School of Health) et al, *Glycemic Characteristics and Clinical Outcomes of COVID-19 Patients Hospitalized in the United States*, at https://glytecsystems.com/wp-content/uploads/Sage.Glycemic-Characteristics-and-Clinical-Outcomes-of-Covid-19-Patients.FINAL_.pdf

[28] *Id.*

[29] American Diabetes Association, *Open Letter to Detention Centers*, at https://www.diabetes.org/sites/default/files/2020-03/COVID-19%20Letter%20to%20Detention%20Centers.pdf

[30] *Id.*

serious complications from COVID-19."[31] But Mr. Plank does not just have sleep apnea, he was diagnosed (in 2014) as having "very severe obstructive sleep apnea."[32] Multiple courts have found sleep apnea as a factor (in combination with other factors) that put one "at increased risk should [Mr. Plank] contract COVID-19."[33]

### 5. COPD

Mr. Plank has also been diagnosed with Chronic Obstructive Pulmonary Disease (COPD).[34] COPD is a chronic lung disease that puts Mr. Plank at greater risk of serious illness from COVID-19. The risks from COVID-19 to those with COPD are dramatic. In a study of over 2000 COVID-19 patients, "COPD was the most strongly predictive comorbidity for both severe disease and ICU admission."[35] The findings from the study established that "COPD patients are particularly vulnerable to critically severe disease." Additional research has shown that this increased risk is based on the increase in "ACE-2 expression in lower airways, which in part may explain the increased risk of severe COVID-19 in these populations."[36]

### B.   FCI Forrest City Low

---

[31] Dr. Carl Rosenberg (Certified by the American Board of Sleep Disorders); *Coronavirus Concerns for Patients with Sleep Apnea*, Sleep Health Solutions Blog (March 22, 2020), at:
https://www.sleephealthsolutionsohio.com/blog/coronavirus-sleep-apnea-cpap-therapy/
[32] Exhibit 5 (Olathe Medical Center Records).
[33] *United States v. Delgado*, __F.Supp.3d __, 2020 WL 2464685 (D. Conn. 2020); *United States v. Saad*, 2020 WL 2251808 (E.D. Mich. 2020); *United States v. Scparta*m __ F.Supp.3d __ , 2020 WL 1910481 (S.D. N.Y. 2020).
[34] D.E. 26 at 13.
[35] Jain V and Yuan J-M, *Systematic review and meta-analysis of predictive symptoms and comorbidities for severe COVID-19 infection*, MedRxiv (March 16, 2020), at
https://doi.org/10.1101/2020.03.15.20035360
[36] Janice Leung, et al, *ACE-2 Expression in the Small Airway Epithelia of Smokers and COPD Patients: Implications for COVID-19*, Eur Respir J 2020, at
https://erj.ersjournals.com/content/erj/early/2020/03/26/13993003.00688-2020.full.pdf

Mr. Plank is serving his sentence at FCI Forrest City low. The conditions at
Forrest City low make social distancing impossible. Although the positive COVID-19
numbers at Forrest City low are some of the highest in the BOP, the actual number is
likely much higher. That is likely true because the facilities that do widespread
testing frequently see positive cases at 70%.[37]

### 1. The numbers

FCI Forrest City low is a "low security federal correctional institution" that
houses 1,826 people.[38] According to the BOP website, 321 people serving sentencing at
FCI Forrest City have already tested positive for COVID-19.[39] And the BOP website
says all of those were at the same facility Mr. Plank is serving his sentence - FCI
Forrest City low facility.[40] These numbers are almost certainly low. BOP Director
Carvajal declared FCI Forrest City as a "hot spot for COVID-19" last month.[41] The
BOP expects that as testing increases, the number of positive tests will likely increase
as well.[42] These increased numbers are likely coming in the next few days as the CDC
was called in to assist in testing at the facility.[43] The Arkansas Department of Health

---

[37] Luke Barr, *70% of inmates tested have COVID-19: Bureau of Prisons*, ABC News (May 1, 2020), at
https://abcnews.go.com/US/70-inmates-tested-covid-19-bureau-prisons/story?id=70454527
[38] BOP Website, *FCI Forrest City Low*, (Viewed April 29, 2020), at
https://www.bop.gov/locations/institutions/for/
[39] BOP Website, *COVID-19 Coronavirus; COVID-19 Cases*, (Viewed May 21, 2020), at
https://www.bop.gov/coronavirus/
[40] *Id.*
[41] Ninette Sosa, *Bureau of Prisons: increases inmate COVID-19 testing*, KNWA Fox 24 (May 8, 2020), at
https://www.nwahomepage.com/lifestyle/health/coronavirus/bureau-of-prisons-increases-inmate-covid-
19-testing/
[42] *Id.*
[43] Ninette Sosa, *Arkansas' federal prison 1 of the nation's highest for COVID-19 cases*, KNWA Fox 24
(May 19, 2020), at https://www.nwahomepage.com/lifestyle/health/coronavirus/arkansas-federal-prison-
1-of-the-nations-highest-for-covid-19-cases/

Secretary confirmed as much this week, when he stated that "Some of those [FCI Forrest City inmates] have recovered, but not all the numbers are in the system yet. We don't have all the details … those will likely be added to our numbers in the next few days."[44]

Besides the numbers themselves being suspect, the way the BOP reports the numbers are also problematic. The BOP website lists statistics for the number of people serving sentences and staff members who have tested positive. The website also lists deaths from people serving sentences and staff members. What the BOP website does not show is the number of people who were actually tested for COVID-19. This is cause for concern. There is a big difference between 40 positive tests out of 80 tests and 40 positive tests out of 500 tests. Without the number of tests given, the total number only indicates the virus is in the prison.

At another federal prison in Butner, North Carolina the facility did widespread testing for the virus.[45] The result? Cases "soared" to 185 positives.[46] When full testing was done at USP Lompoc (in California), 90% of the prison was positive for COVID-19.[47] When the BOP is updating its numbers, the BOP admits that its numbers only account for positive tests.[48] The lack of testing inside BOP facilities is so serious, that

---

[44] *Id.*

[45] Dan Kane, *Butner prison steps up coronavirus testing, and cases soar*, The News & Observer, (April 27, 2020), at https://www.newsobserver.com/news/coronavirus/article242327466.html

[46] *Id.*

[47] Ninette Sosa, *Arkansas' federal prison 1 of the nation's highest for COVID-19 cases*, KNWA Fox 24 (May 19, 2020), at https://www.nwahomepage.com/lifestyle/health/coronavirus/arkansas-federal-prison-1-of-the-nations-highest-for-covid-19-cases/

[48] Walter Pavlo, *Bureau of Prisons Underreporting COVID-19 Outbreaks in Prison*, Forbes (April 1, 2020), at https://www.forbes.com/sites/walterpavlo/2020/04/01/bureau-of-prisons-underreporting-outbreaks-in-prison/#2cebe60a7ba3

high profile members of the Senate from both parties have expressed "worry that BOP is significantly underestimating the rate of COVID-19 infection in BOP facilities because BOP has not yet conducted the number of tests on staff or inmates appropriate for facilities where a highly contagious virus can be easily spread."[49] In facilities where the BOP has done testing, over 70% of those tested were positive for COVID-19, "strongly suggesting there are far more COVID-19 cases left uncovered."[50]

## 2. "It's like Mad Max in here"

The over 1,800 men serving sentences at FCI Forrest City low are packed in the facility "like sardines."[51] In one unit, at least 160 men share one drinking fountain.[52] A similar number of men share six toilets, five urinals and twelve showers.[53] While social distancing is "typically a physical impossibility" in a prison environment, it seems uniquely impossible at Forrest City low.[54] If a person serving a sentence does get a test, he is sent back into population before the results are even in.[55] A video

---

[49] Press Release for Senator Durbin and Grassley, *Durbin, Grassley Press DOJ IG to Review Implementation of First Step Act & Cares Act in BOP COVID-19 Investigation*, (April 24, 2020), at https://prisonology.com/wp-content/uploads/2020/04/COVID-19-Press-Release-From-Durbin-Grassley.pdf

[50] Michael Balsamo, *Over 70% of tested inmates in federal prisons have COVID-19*, AP News (April 30, 2020), at https://apnews.com/fb43e3ebc447355a4f71e3563dbdca4f

[51] Paige Cushman, '*It's like Mad Max in here': Arkansas inmate says conditions woeful amid outbreak*, KATV News (April 15, 2020), at https://katv.com/news/local/its-like-mad-max-in-here-inmates-at-arkansas-prison-panic-amid-outbreak

[52] *Id.*

[53] Quametra Wilborn, *Inmates ask for help as COVID-19 breaks out in Forrest City prison*, WREG News (April 9, 2020), at https://wreg.com/news/inmates-ask-for-help-as-covid-19-breaks-out-in-forrest-city-prison/

[54] Dr. Laura Hawks, Dr. Steffie Woolhandler & Dr. Danny McCormick, *COVID-19 in Prisons and Jails in the United States*, JAMA Intern Med. (April 28, 2020), at https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2765271

[55] Paige Cushman, '*It's like Mad Max in here': Arkansas inmate says conditions woeful amid outbreak*, KATV News (April 15, 2020), at https://katv.com/news/local/its-like-mad-max-in-here-inmates-at-arkansas-prison-panic-amid-outbreak

provided as **Exhibit 6** "shows inmates sleeping closely together, empty soap dispensers, broken toilets, and faulty sinks."[56] Incarcerated people are not the only ones complaining – leadership in the local prison union stated that they "would love to tell you that I think they were 100% prepared, but I cannot wholeheartedly say that."[57] The conditions led at least one person at Forrest City to describe the situation in the prison: "it's like Mad Max in here."[58]

### C.     Mr. Plank's conviction

In June 2017, a grand jury charged Mr. Plank with one count of possession with intent to distribute more than 50 grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1). Mr. Plank appeared before a magistrate judge on June 12, 2017 and was released with conditions. D.E. 5. Mr. Plank remained on release until March, 2018, when Mr. Plank pleaded guilty without an agreement to the indictment. The indictment related to drug sales Mr. Plank made in 2016 to a confidential source. D.E. 1; D.E. 39 at 5. The combined 2016 drug sales were 151.5 grams of ice methamphetamine. D.E. 39 at 5. A subsequent search of Mr. Plank's home uncovered an additional 655.49 grams. *Id.* at 6. Mr. Plank was also held responsible, through relevant conduct, for a much larger amount of methamphetamine related to conduct in 2013. *Id.*

---

[56] *Id.*

[57] Quametra Wilborn, *Prison union points to transfer inmates as root of Forrest City coronavirus outbreak*, WREG News (April 10, 2020), at https://wreg.com/news/prison-union-points-to-transfer-inmates-as-root-of-forrest-city-coronavirus-outbreak/

[58] Paige Cushman, '*It's like Mad Max in here': Arkansas inmate says conditions woeful amid outbreak*, KATV News (April 15, 2020), at https://katv.com/news/local/its-like-mad-max-in-here-inmates-at-arkansas-prison-panic-amid-outbreak

Mr. Plank was released from custody six-weeks after he entered his plea. That release was based on a combination of factors including his excellent performance while on release before his plea (including the fact that he was allowed to travel out of state for his sons football games), and that his Mother had fallen and injured herself.[59] Mr. Plank was released to home confinement with the only exception to drive his mother to doctor's appointments.[60] Mr. Plank complied fully with the Court's order of home confinement for nearly a year until he was sentenced and surrendered into custody.

### D.   Mr. Plank's sentencing

Mr. Plank objected to the PSR and filed a sentencing memorandum in advance of sentencing. D.E. 39 at 20; D.E. 42. Mr. Plank requested a variance based on his mitigating role in the 2013 drug seizure (largely that he stored the drugs at his home for another person for a short period of time), and because the ice methamphetamine guideline is not based on data or national experience. D.E. 39 at 21-24; D.E. 42 at 9-13.  Based on a combination of these mitigating issues (including the personal characteristics of Mr. Plank), his sentencing memo requested a variance to 97 months. D.E. 42 at 1. The government responded to Mr. Plank's arguments. D.E. 43. Mr. Plank replied as well. D.E. 44.

Mr. Plank gave up his various arguments for mitigation and entered into a sentencing agreement with the government. D.E. 47. That agreement included a

---

[59] See D.E. 33.
[60] D.E. 36 (Order Releasing Mr. Plank).

joint recommendation to a sentence of 144 months with 5 years' supervised release to follow. *Id.* In exchange for this agreement, Mr. Plank waived the issues he presented in his objections and sentencing memorandum (and reply). *Id.* The Court ultimately adopted the recommendations in the sentencing agreement. D.E. 48.

## Argument

### A.    The Court has jurisdiction to consider the motion for a sentence reduction and grant the requested relief.

The first inquiry is a jurisdictional one, or whether the Court has the power to consider the motion for a sentence reduction filed by Mr. Plank. Under the old paradigm, BOP had to file motions for reductions on behalf of inmates. However, the First Step Act changed the requirement that the motion must be filed by the BOP.

The statute was amended so that now the Court can consider a sentence reduction "upon a motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the Warden at the defendant's facility, whichever is earlier."[61] In other words, this provision gives federal courts the ability to hear and resentence a defendant even in the absence of a BOP motion.

This motion is properly before the Court. Mr. Plank filed a written request "requesting compassionate release" to Warden DeWayne Hendrix of FCI Forrest City on March 29, 2020.[62] As of May 22, 2020 – well over 30 days since his request - Mr.

---

[61] First Step Act § 603(b) (2018), codified at 18 U.S.C. § 3582(c)(1)(A).
[62] Exhibit 7

Plank has not received a response from the warden.

**B.    The Court can determine whether "extraordinary and compelling reasons" exist without complete deference to the Bureau of Prisons.**

This Court may grant Mr. Plank's motion for a reduction of his term of imprisonment if "extraordinary and compelling reasons warrant such a reduction."[63] Congress has not specified the circumstances that qualify as "extraordinary and compelling reasons," except to state that a reduction pursuant to this provision must be "consistent with applicable policy statements issued by the Sentencing Commission."[64]

The Sentencing Commission policy statement is found in § 1B1.13. It has not been amended since the passage of the First Step Act. Notably, it still says the Court may reduce a term of imprisonment "[u]pon a motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A)." Additionally, Application Note 1 of § 1B1.13 says that a defendant may be entitled to a sentence reduction if, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in connection with, the reasons described in subdivisions (A) through (C)" of the application note.[65]

The Sentencing Commission's policy statement made the BOP the gatekeeper to both filing a motion for a reduction in the first instance and to determining whether "extraordinary and compelling reasons" warrant a sentence reduction. Put differently,

---

[63] 18 U.S.C. § 3582(c)(1)(A)(i).
[64] 18 U.S.C. § 3582(c)(1)(A).
[65] § 1B1.13, n.1(D).

the policy statement grants the BOP enormous discretion regarding these motions,

commonly referred to as compassionate release motions.

The First Step Act changed the law to shift the discretion to the judiciary and

away from the BOP. Since the passage of the First Step Act, in the past year, several

courts have wrestled with the question how to interpret the Sentencing Commission's

policy statement now that the First Step Act modified the role of the BOP in the

compassionate release process.

Although not an exhaustive catalog of all cases, the overwhelming majority of

courts have determined that "the Bureau of Prisons is no longer an obstacle to a

court's consideration of whether compassionate release is appropriate."[66]  Though, at

least one court held that it remains bound to the Sentencing Commission's policy

statement regarding the substantive determination as to what are "extraordinary and

---

[66] *United States v. Fox*, No. 2:14-CR-03-DBH, 2019 WL 3046086, at *3 (D. Me. July 11, 2019); *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i). An interpretation of the old policy statement as binding on the new compassionate release procedure is likely inconsistent with the Commission's statutory role."); *United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *3 (S.D. Tex. June 17, 2019) ("Because the Commission's statutory authority is limited to explaining the appropriate use of sentence-modification provisions under the *current* statute, 28 U.S.C. § 994(a)(2)(C), an amendment to the statute may cause some provisions of a policy statement to no longer fall under that authority ....") (emphasis in original)); *United States v. Brown*, No. 4:05-CR-00227-1, 2019 WL 4942051, at *4 (S.D. Iowa Oct. 8, 2019) ("Therefore, if the FSA is to increase the use of compassionate release, the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it."); *United States v. AdaMr*, No. 6:94-CR-302, 2019 WL 3751745, at *3 (M.D.N.C. Aug. 8, 2019) (holding that the Director of the Bureau of Prisons' prior "interpretation of 'extraordinary and compelling' reasons is informative," but not dispositive.); *United States v. Bucci*, No. CR 04-10194-WGY, 2019 WL 5075964, at *1 (D. Mass. Sept. 16, 2019) ("This Court agrees with Judge Hornby of the District of Maine that interpreting the Sentencing Commission's guidance on compassionate release today begins with the premise that '[t]he First Step Act did not change the statutory criteria for compassionate release, but it did change the procedures, so that the Bureau of Prisons is no longer an obstacle to a court's consideration of whether compassionate release is appropriate.'") (citation omitted).

compelling reasons" despite the passage of the First Step Act.[67]

We ask the Court to join the majority view that it is the Court, not the Bureau of Prisons, who decides what are "extraordinary and compelling reasons" that may warrant relief, and whether they are present in this case.  Indeed, the District of Kansas has already taken this stance in *United States v. Perez*, No. 88-10094-1-JTM, D.E. 175, (D. Kan. Mar. 11, 2020)( "As a majority of district courts have concluded, this court concludes that it has the authority to exercise the same discretion as the BOP when weighing a request for compassionate relief.")

The Court can assume that when Congress passed § 603(b) of the First Step Act, it did so with full knowledge of how BOP had interpreted and effectuated the prior version of the statute.[68] Again, Congress was clear by how it titled § 603(b) that Congress's intent was to (as it says) "increas[e] the use and transparency of compassionate release."[69] This language could not be more clear—Congress wants to use compassionate release more.

C.   **The "extraordinary and compelling reasons" present here warrant the Court granting the relief requested.**

As stated above, the Court can exercise its own discretion as to what

---

[67] *United States v. Lynn*, No. CR 89-0072-WS, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019) ("The Commission may well decide that, since BOP is no longer the gatekeeper regarding the filing of motions for compassionate release, neither should it be the gatekeeper regarding the residual category of extraordinary and compelling reasons for compassionate release. Should the Commission so amend its policy statement, the courts will of course be bound by Section 3582(c)(1)(A) to follow the amended version. Until that day, however, the Court must follow the policy statement as it stands.").

[68] *See, e.g.*, *Food & Drug Admin. v. Brown & WilliaMron Tobacco Corp.*, 529 U.S. 120, 144 (2000) (noting Congress has "effectively ratified the FDA's long-held position that it lacks jurisdiction under the FDCA to regulate tobacco products").

[69] *Yates v. United States*, 135 S. Ct. 1074, 1090 (2015) (J. Alito, concurring) ("Titles can be useful devices to resolve 'doubt about the meaning of a statute.'") (citation omitted).

constitutes "extraordinary and compelling reasons" to warrant a sentence reduction. The only statutory limitation is that the sentence reduction must be "consistent with application policy statements issued by the Sentencing Commission."[70]

We start first with the extraordinary and compelling reasons present here. As modified by the First Step Act, 18 U.S.C. § 3582(c)(1)(A) provides:

> "The court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant…may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that…extraordinary and compelling reasons warrant such a reduction...and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."

Mr. Plank is asking the court to consider his combination of medical risks and the conditions at FCI Forrest City low. First, Mr. Plank has a number of serious health-related issues that place him at the highest risk of serious illness if infected with COVID-19.

Mr. Plank's condition is further complicated by the COVID-19 global pandemic. According to BOP's website, 4502 people incarcerated in BOP facilities have tested positive for COVID-19 and fifty-eight have died as of May 21, 2020.[71] Courts all across the country have factored COVID-19 into their rationales for granting compassionate release.[72]  Multiple court's have found the combined factors present in Mr. Plank's

---

[70] 18 U.S.C. § 3582(c)(1)(A).
[71] Bureau of Prisons, *COVID-19 Coronavirus*, at www.bop.gov/coronavirus/ (accessed May 21, 2020).
[72] Compassionate Release: *United States v. Hernandez*, No. 18-cr-20474, D.E. 41 (S.D. Fla. Apr. 2, 2020) (granting unopposed motion for compassionate release for defendant with cancer & immunosuppression and just under 12 months left to serve on 39 month sentence); *United States v. Perez*, No. 1:17-cr-513-AT, D.E. 98 (S.D.N.Y. Apr. 1, 2020) (granting compassionate release where "[t]he benefits of keeping [Perez] in prison for the remainder of his sentence are minimal, and the potential

case (many with much less) were sufficient to establish "extraordinary and compelling reasons warrant a sentencing reduction based on his medical conditions and the COVID-19 outbreak at [FCI Forrest City low]."[73] There is no question Mr. Plank falls within this pool of high-risk inmates susceptible to the virus.

---

consequences of doing so are extraordinarily grave"); *United States v. Rodriguez*, No. 2:03-cr-271-AB, D.E. 135 (E.D. Pa. Apr. 1, 2020) (granting release after finding risk factors for COVID-19 constitute extraordinary and compelling reason and noting that prisons are "tinderboxes for infectious disease"); *United States v. Gonzalez*, No. 2:18-cr-232-TOR, D.E. 834 (E.D. Wash. Mar. 31, 2020) (releasing defendant one month into a 10 month sentence in light of medical issues; ordinarily these conditions would be manageable but "these are not ordinary times"); *United States v. Marin*, No. 15-cr-252, D.E. 1326 (E.D.N.Y. Mar. 30, 2020) ("[F]or the reasons stated in his motion, including his advanced age, significantly deteriorating health, elevated risk of dire health consequences due to the current COVID-19 outbreak, status as a non-violent offender, and service of 80% of his original sentence."); *United States v. Muniz*, Case No. 4:09-cr-199, D.E. 578 (S.D. Tex. Mar. 30, 2020) (releasing defendant serving 188-month sentence for drug conspiracy in light of vulnerability to COVID-19: "[W]hile the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers within the United States and beyond our borders in China and Iran demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection."); *United States v. Bolston*, Case No. 1:18-cr-382-MLB, D.E. 20 (N.D. Ga. Mar. 30, 2020) (releasing defendant in part because "the danger inherent in his continued incarceration at the R.A. Deyton Detention Facility . . . during the COVID-19 outbreak justif[y] his immediate release from custody"); *United States v. Powell*, No. 1:94-cr-316-ESH, D.E. 98 (D.D.C. Mar. 28, 2020) (granting unopposed motion for compassionate release in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust in light of open misdemeanor case); *United States v. Campagna*, 2020 WL 1489829 (S.D.N.Y. Mar. 27, 2020) (compassionate release grant); *United States v. Copeland*, No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020) (granting First Step Act relief to defendant in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments that defendant has during this current pandemic"); *United States v. Underwood*, Case No. 8:18-cr-201-TDC, D.E. 179 (Mar. 31, 2020) (encouraging release to furlough of elderly defendant in BOP custody because, even though no positive of COVID-19 in his facility, "there is significant potential for it to enter the prison in the near future"). Immigration: *Jovel v. Decker*, Not reported in F.Supp., 2020 WL 1467397 at 1 (S.D. N.Y., March 26, 2020) ("in light of the considerable—and growing—concern surrounding the COVID-19 health crisis, including limited access to medical supplies, treatment, and attention, as well as Petitioner's separate personal medical issues, this Court finds that Petitioner has adequately demonstrated extraordinary circumstances requiring his release."). *Basank v. Decker*, __ F.Supp.3d __, 2020 WL 1481503 (S.D. N.Y., March 26, 2020) (issuing temporary restraining order releasing petitioners from ICE custody). The Department of Justice sees the threat. *See* DOJ, *Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic*, Att'y Gen. (Mar. 26, 2020) (Ordering the Director of the Bureau of Prisons to "prioritiz[e] home confinement as appropriate in response to the COVID-19 pandemic . . . to protect the health and safety of BOP personnel and the people in our custody.").
[73] *United States v. Delgado*, __F.Supp.3d __, 2020 WL 2464685 at *3 (D. Conn. 2020) (obesity and sleep apnea); *United States v. Saad*, 2020 WL 2251808 (E.D. Mich. 2020) (hypertension and sleep apnea); *United States v. McCarthy*, __ F.Supp.2d __, 2020 WL 1698732 (D. Conn. 2020) (COPD and asthma);

### E.   Mr. Plank's request for relief

Mr. Plank is requesting a time-served sentence. It is the only avenue available to the Court to remove Mr. Plank from the life-threatening risk he faces at Forrest City low. That is because although the BOP has the tools to temporarily release Mr. Plank, or grant him home confinement neither have been used sufficiently. Attorney General Barr's memo of March 26 outlines the criteria for incarcerated people to be released to home confinement "to decrease the risk to their health."[74] Mr. Plank meets the criteria in that he is vulnerable to COVID-19, he is at a low security facility, his conduct in prison is without issue and he has met all rules and expectations, he scored low risk on the BOP criteria, he has a demonstrated release plan, and his conviction and criminal history do not involve violence or any other offenses that make him ineligible.[75] Even though he meets the criteria, Mr. Plank has not been released. Nor has the BOP disclosed how many people have been transferred to home confinement at Forrest City.[76] Attorney General Barr's second memo asked the BOP to focus on facilities with "significant levels of infection" such as Forrest City.[77] Attorney General's memo mentioned that "time is of the essence" in dealing with the spread of the virus.[78] The time to focus on the outbreak at Forrest City is now.

---

[74] Attorney General William Barr, *Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic*, Memorandum for Director of Bureau Prisons (March 26, 2020), at https://www.bop.gov/resources/news/pdfs/20200405_covid-19_home_confinement.pdf
[75] *Id*.
[76] Joseph Flaherty, *Some Arkansas prisoners get early release; details on numbers murky*, Arkansas Democrat Gazette (May 3, 2020), at https://www.arkansasonline.com/news/2020/may/03/some-prisoners-get-early-release-detail-1/?news-arkansas
[77] Attorney General William Barr, *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19*, Memorandum for Director of Bureau Prisons (April 3, 2020), at https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf
[78] *Id*.

In other facilities with similar problems, the BOP has failed to make adequate use of the authority to remove medically vulnerable people from the dangerous conditions at the prison.[79] That failure was evidenced by the fact that BOP had only reviewed approximately 15% of the people serving sentences at FCI Danbury for home confinement and only released 21 of the nearly 1,000 people serving sentences in the prison.[80] The same is true at FCI Elkton in Ohio, where one federal judge referred to the BOP's efforts to release people on home confinement as "minimal" and accused the BOP of "thumbing their nose at the authority to authorize home confinement."[81]

We understand this request is a substantial reduction in Mr. Plank's sentence. But because of Mr. Plank's numerous and serious health issues, and the BOP's failure to ensure his safety, it is the only option he has. As another district court opined:

> "The Court's preferred course of action would have been to grant her temporary release, removing her from FCI Danbury during the pandemic while requiring her to eventually serve the remainder of her sentence once the danger from COVID-19 had subsided." *United States v. Park*, No. 16-cr-473 (RA), 2020 WL 1970603, at *5 (S.D.N.Y. Apr. 24, 2020). Clearly, that would be the preferable solution for Mr. Delgado, given his original sentence and his criminal history. "But the mechanism for granting temporary release—18 U.S.C. § 3622(a)—lies solely in the BOP's hands, leaving the Court without any authority to grant the relief it believes most proper in this instance." *Id.* ("The Court fears that leaving Ms. Park any longer at FCI Danbury may convert a three-year prison sentence into a death sentence. And that the Court cannot allow."). In the absence of such relief from BOP, reduction of Mr. Delgado's sentence to time served is consistent with U.S.S.G. § 1B1.13 because extraordinary and compelling reasons warrant the reduction. The terms of the sentence modification, while not ideal, should ensure that Mr. Delgado will not pose a danger to the safety of any other person or to the

---

[79] Walter Pavlo, *Federal Judge Demands Action at Danbury Federal Prison as COVID-19 Spreads*, Forbes (May 14, 2020), at https://www.forbes.com/sites/walterpavlo/2020/05/14/federal-judge-demands-action-at-danbury-federal-prison-as-covid-19-spreads/#345b17149599
[80] *Id.*
[81] *Wilson v. Williams*, 4:20-cv-00794 D.E. 85 (N.D. Ohio); at https://www.documentcloud.org/documents/6896091-BOP-vs-ACLU-Elkton-Order-to-Enforce.html

community. Mr. Delgado will be on supervised release at home during the time he would have been incarcerated.[82]

Similar to the court's ruling in *Delgado*, Mr. Plank proposes the following:

1) Placement on home confinement as a condition of his current term of supervised release (five years). Home confinement is authorized as a condition of supervised release under 18 U.S.C. § 3583(d)(3) which permits the Court to impose "any condition set forth as a discretionary condition of probation in section 3583(b)" that is also consistent with pertinent policy statements made by the Sentencing Commission. Home confinement is authorized as a condition of probation, but only "as an alternative to incarceration," as it is here.[83]

2) Extend his total term of supervised release to ten-years. The intent of this extension is to require Mr. Plank to serve home confinement in lieu of imprisonment, and then serve the five-years of supervised release the Court originally ordered he serve. The Court is authorized to extend a term of supervised release.[84] The maximum term of supervised release for a violation of 21 U.S.C. § 841(b)(1) is life.[85] The Court is also authorized to extend the term of supervised release without a specific "changed circumstances" finding (although it could easily find one here).[86]

We understand that a five-year sentence of home confinement is less than the prison sentence Mr. Plank has remaining at Forrest City low. Mr. Plank is currently set for release in April, 2029. That projection is incomplete and does not factor in a number of ways in which Mr. Plank is eligible to reduce that sentence. We discuss each here.

**Earned time credits**

---

[82] *United States v. Delgado*, __F.Supp.3d __, 2020 WL 2464685 (D. Conn. 2020).
[83] 18 U.S.C. § 3563(b)(19)That subsection authorizes the requirement that Mr. Plank "remain at his place of residence during nonworking hours and, if the court finds it appropriate, that compliance with this condition be monitored by telephonic or electronic signaling devices, except that a condition under this paragraph may be imposed only as an alternative to incarceration."
[84] 18 U.S.C. § 3583(e)(2).
[85] *United States v. Handley*, 678 F.3d 1185, 1188 (10th Cir. 2012).
[86] *United States v. Begay*, 631 F.3d 1168, 1172 (10th Cir. 2011).

The First Step Act passed in December, 2018. Among other things, the act creates "earned time credits for completion of recidivism education programs."[87] Mr. Plank is eligible for earned time credits because he has scored as a low recidivism risk under the risk assessment and was not convicted of a disqualifying offense. Mr. Plank could earn up to 15 days earned time credit (if he remains in the minimum or low risk category for two consecutive assignments) for every 30 days of successful participation in an "evidence based recidivism reduction" program or productive activity. 18 U.S.C. § 3632(d)(4),(5). If he were to complete only four programs a year for six years, he would reduce his sentence by one year. He could easily complete more.

**Residential Drug Abuse Program**

Mr. Plank is also eligible to enter into and completed the Residential Drug Abuse Program (RDAP). The RDAP is typically a 9-month program with a half-day of programming and a half-day of work or school-related activities.[88] Completion of the RDAP allows a twelve-month early release from BOP.[89]

**Home Confinement**

Mr. Plank would be eligible for home confinement for the final six-months of his sentence.[90] The BOP considers people, like Mr. Plank, who are low and minimum security "for possible direct placement on home confinement." The criteria involves

---

[87] Federal Bureau of Prisons Website, *First Step Act – Frequently Asked Questions* (Accessed May 11, 2020), at https://www.bop.gov/inmates/fsa/faq.jsp#fsa_overview

[88] Bureau of Prisons Website, *Substance Abuse Treatment*, (Accessed May 12, 2020), at https://www.bop.gov/inmates/custody_and_care/substance_abuse_treatment.jsp

[89] 18 U.S.C. § 3621(e)(2)(B); U.S. Department of Justice; Federal Bureau of Prisons Program Statement, *Early Release Procedures under 18 U.S.C. § 3621(e)* (March 16, 2009), at https://www.bop.gov/policy/progstat/5331_002.pdf

[90] 18 U.S.C. § 3624(c)(2).

appropriate release plan, no disciplinary issues, and medical or mental health needs that can be met in the community.[91] Such confinement involves placement at a verified release plan, and often includes electronic monitoring equipment.[92] Direct placement on home confinement is considered appropriate for those with no public safety factors, excellent performance inside the prison, a stable residence with supportive family, and little or no need for RRC placement.[93]

**Penalties available to the Court**

Based on the programs listed, Mr. Plank could conservatively be released from the BOP in six to six and a half years. Because Mr. Plank was convicted of a violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(viii), the offense is a Class A felony.[94] If Mr. Plank were to violate any terms of his five-year term of supervised release, the Court would have the authority to revoke his term and impose a sentence of five-years in prison.[95] The Court would also be authorized to impose another five-year term of supervised release after imposing such a prison sentence.[96] In fact, the Court could impose a term of supervised release of life for Mr. Plank to follow a five-year term of imprisonment if he violated any terms of his supervised release.[97] And, of course, the Court could impose future five-year prison terms for Mr. Plank if he violated again.

---

[91] U.S. Department of Justice; Federal Bureau of Prisons, *Guidance for Home Confinement and Residential Reentry Center Placements* (May 24, 2013), at https://www.bop.gov/foia/rrc_hc_guidance_memo.pdf
[92] U.S Department of Justice; Federal Bureau of Prisons, *Home Confinement Program Statement* (September 6, 1995), at https://www.bop.gov/policy/progstat/7320_001_CN-1.pdf
[93] *Id*. at 8.
[94] 18 U.S.C. § 3559(a)(1).
[95] 18 U.S.C. § 3583(e)(3).
[96] 18 U.S.C. § 3583(h).
[97] *United States v. Handley*, 678 F.3d 1185, 1189 (10th Cir. 2012).

**D.    The requested relief is consistent with the Sentencing Commission's policy statements.**

The second statutory requirement is that the sentence reduction must be "consistent with applicable policy statements issued by the Sentencing Commission."[98] The applicable policy statement is found in § 1B1.13 of the Sentencing Guidelines. Application Note 1 of § 1B1.13(1), which creates certain criteria for evaluating extraordinary and compelling circumstances, provides a catchall provision entitled "other reasons." It states, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." This portion of the policy statement provides this court with the flexibility to determine whether a defendant is worthy of relief even though he may not fit neatly into the medical condition, age or family circumstances criteria set forth in previous subsections. Mr. Plank's combination of medical conditions put him at serious risk of death if he contracts COVID-19. The virus is in the facility and spreading right now. These factors support an extraordinary and compelling finding.

**E.    Release Plan—Mr. Plank has family support and a place to live.**

Finally, if the Court grants the requested relief Mr. Plank intends to reside at his home in Gardner, Kansas. Mr. Plank's home is on property owned by his family. Also living on the property (in another home) is his mother, Vivian Plank. Ms. Plank is retired but previously worked in a number of jobs including in the kitchen of a

---

[98] 18 U.S.C. § 3582(c)(1)(A).

halfway house program in Johnson County, Kansas. Mr. Plank lived at this residence for well over a year while the case was pending without issue, including nearly a year on home confinement after his guilty plea. Counsel confirmed the following with Ms. Plank that: (1) Mr. Plank's home is ready and available for him to move in; (2) Mr. Plank can quarantine himself at the home for two weeks after his release; (3) there are no firearms or other weapons in the home; and (4) no person with a criminal record lives on the property. Contact information for Ms. Plank has been provided to the United States Probation Office and to the government.

## Conclusion

The Court has the jurisdiction and the discretion to decide whether to grant the motion to reduce Mr. Plank's sentence. Both Mr. Plank's medical condition and his sentence present extraordinary and compelling reasons for a reduction to time served. Mr. Plank prays upon the Court's compassion and asks for an expeditious ruling in his favor.

Respectfully submitted,

s/David Magariel
David M. Magariel, #21748
Assistant Federal Public Defender for the
District of Kansas
500 State Avenue, Suite 201
Kansas City, KS 66101
Phone: 913-551-6712
Fax: 913-551-6562
Email: david_magariel@fd.org
Attorney for Defendant

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 22, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all interested parties and to the following:

Jared Maag
Assistant United States Attorney
jared.maag@usdoj.gov

Sheri Catania
Assistant United States Attorney
sheri.catania@usdoj.gov


s/David Magariel
David Magariel, #21748